☐ Original      ☐

CLERK'S OFFICE
A TRUE COPY
Feb 05, 2024
s/ JDH
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of )<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)* )<br>5674 South 14th Street, Milwaukee, )<br>Wisconsin, as further described in Attachment )<br>A ) | Case No. **24-M-313 (SCD)** |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Eastern_____ District of _____Wisconsin_____ *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before _____2-19-24_____ *(not to exceed 14 days)*

☑ in the daytime 6:00 a.m. to 10:00 p.m.      ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Hon. Stephen C. Dries_____ .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for _____ days *(not to exceed 30)*      ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:      2-5-24. 10:15 am                    *(signature)*
_____    _____
*Judge's signature*

City and state:    Milwaukee, WI                    Honorable Stephen C. Dries, U.S. Magistrate Judge
_____    *Printed name and title*

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

      I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

 

_____
*Executing officer's signature*

_____
*Printed name and title*

# ATTACHMENT A

## Property to Be Searched

1. 5674 South 14th Street, Milwaukee, Wisconsin is a two-story, single-family residence located on east side of South 14th Street. The residence includes tan siding, white privacy fence and an attached two-car garage. The property also includes a detached shed located in the backyard. The number "5674" is affixed on the attached garage and is visible from South 14th Street. The building is depicted below:



1

<u>**ATTACHMENT B**</u>

**Particular Things to be Seized**

Violations of Title 18 U.S.C. § 2119 (carjacking), Title 21 U.S.C. § 841(a)(1) (distribution of a controlled substance), and Title 18 U.S.C. § 1956 (money laundering). More specifically, the controlled substances include  marijuana, and any other controlled substances; paraphernalia associated with the use, storage, distribution, possession and/or manufacture of controlled substances, including but not limited to, scales, drug packaging materials, buyers and sellers lists; containers associated with the storage of controlled substances; various other chemicals, utensils, equipment or apparatus associated with the manufacture of controlled substances; and the following:

1) Books, records, receipts, bank statements and records, money drafts, letters of credit and/or other documents relating to financial transactions;

2) Address and/or telephone books and papers reflecting names, addresses and/or telephone numbers;

3) Books, records, receipts, notes, ledgers, photographs, videos, and other papers relating to the transportation, ordering, manufacture, possession and/or distribution of controlled substances;

4) Indicia of occupancy, residency and/or ownership of the premises described above, including, but not limited to utilities and telephone bills, cancelled envelopes, keys and lease agreements, loan records and/or any other document which contains indicia of occupancy;

5) U.S. currency and any other financial instruments or proceeds; Records of accounts and transactions involving electronic currency and their platforms, including the keys or recovery codes for associated accounts, transaction confirmations, account statements, communications, and documentation of any transactions or their purpose;

6) United States Postal Parcel boxes, receipts, labels and shipping related items;

7) Counter surveillance devices such as video surveillance systems and radio communications systems;

2

8) Firearms, ammunition, or that may represent possession of a firearms in furtherance of drug trafficking;

9) Safes and their contents;

10) Electronic equipment and devices, including but not limited to: computers and associated memory storage devices, cellular telephones, and pagers, answering machines and caller ID devices, and a forensic examination of any memory data contained therein; and

11) For any electronic storage device, computer hard drive, electronic device, or other physical object upon which electronic information can be recorded (hereinafter, electronic storage device) that is called for by this warrant, or that might contain things otherwise called for by this warrant:

    a. evidence of who used, owned, or controlled the electronic storage device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

    b. evidence of software that would allow others to control the electronic storage device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

    c. evidence of the lack of such malicious software;

    d. evidence indicating how and when the electronic storage device was accessed or used to determine the chronological context of electronic storage device access, use, and events relating to crime under investigation;

    e. evidence indicating the electronic storage device user's location and state of mind as it relates to the crime under investigation;

    f. evidence of the attachment to the electronic storage device of other storage devices or similar containers for electronic evidence;

    g. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the electronic storage device;

    h. evidence of the times the electronic storage device was used;

    i. passwords, encryption keys, and other access devices that may be necessary to access the electronic storage device;

3

j.  documentation and manuals that may be necessary to access the electronic storage device or to conduct a forensic examination of the electronic storage device; and

k.  contextual information necessary to understand the evidence described in this attachment.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the ATF may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

4



# UNITED STATES DISTRICT COURT
for the
Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>5674 South 14th Street, Milwaukee, Wisconsin,<br>as further described in Attachment A | )<br>)<br>)<br>)<br>)<br>)    Case No. **24-M-313 (SCD)** |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A.

located in the _____ Eastern _____ District of _____ Wisconsin _____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 1956; 2119; and<br>21 U.S.C. § 841(a)(1) | Money laundering; Carjacking; and Distribution of a controlled substance. |

The application is based on these facts:

See Attached Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of \_\_\_\_\_ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Digitally signed by RickHankins409017232-92997*
*DN: c=US, o=Sprint, ou=External, ou=eSite, cn=RickHankins409017232-92997*
*Date: 2024.02.02 14:09:07 -06'00'*

*Applicant's signature*

Rick Hankins, ATF SA

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____ *(specify reliable electronic means).*

Date: 2-5-24

*Judge's signature*

City and state: Milwaukee, WI      Honorable Stephen C. Dries, U.S. Magistrate Judge

*Printed name and title*

CLERK'S OFFICE<br>A TRUE COPY<br>Feb 05, 2024<br>s/ JDH<br>Deputy Clerk, U.S. District Court<br>Eastern District of Wisconsin

I, Rick Hankins, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the residence of Alfredo ACOSTA (DOB: xx/xx/1997) located at 5674 South 14th Street, Milwaukee, State and Eastern District Wisconsin, (TARGET RESIDENCE) further described in Attachment A, and seize the property described in Attachment B, namely evidence of conspiracy to commit carjacking and drug trafficking.  The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) and the Milwaukee Police Department are investigating Alfredo ACOSTA and others for violations of Title 18 U.S.C. § 2119 (carjacking), Title 21 U.S.C. § 841(a)(1) (distribution of a controlled substance), and Title 18 U.S.C. § 1956 (money laundering).  The investigation has shown that Alfredo ACOSTA'S belongings, including his cellphones that were believed to have been used to communicate with alleged carjacker(s), are being stored at 5674 South 14th Street, Milwaukee, Wisconsin. I also believe ACOSTA'S cellphone(s) have also been used in communications to facilitate the unlawful distribution of narcotics, namely marijuana.  I further believe information provided in this affidavit will detail that ACOSTA has engaged in the unlawful distribution of narcotics for at least one year and that his narcotic sales appear to be his primary source of income.

2.      I am a Special Agent of the U.S. Department of Justice's ATF, currently assigned to the Milwaukee Field Office. I have been so employed since April 2003. My duties as a Special Agent with the ATF include investigating alleged violations of the federal firearms, explosives, and arson statutes.

3.      I have completed approximately 26 weeks of training at the Federal Law Enforcement Training Center in Glynco, Georgia, as well as the ATF National Academy.  That training included various

1

legal courses related to constitutional law as well as search and seizure authority. Additionally, I have received training on how to conduct various tasks associated with criminal investigations, such as interviewing, surveillance, and evidence collection.

4.      In addition to my duties as a criminal investigator, I am also an ATF Certified Fire Investigator (CFI). As an ATF CFI, I am tasked with providing expert opinions as to the origin and cause of fires. I obtained the ATF CFI certification in 2009 following a two-year training program that centered on various fire science topics including, but not limited to: chemistry, fire dynamics and building construction. The two-year ATF CFI certification program consisted of college courses, written exams, research papers, reading assignments, practical training exercises and test burns of various materials. I am re-certified annually as an ATF CFI. To date, I have participated in over 300 fire scene examinations and have testified as an expert. Additionally, I have been certified as a fire investigator by the International Association of Arson Investigators since June 2011. I have received over 1,600 class hours of fire-related training. Furthermore, I have been an instructor regarding fire-related topics on multiple occasions for many agencies and institutions in several states. I have also participated in over 223 live fire training exercises, where I started training fires and observed fire growth and development. Finally, I was a full-time instructor at the ATF National Academy from approximately August 2015 to August 2016, where I taught several topics during Special Agent Basic Training for new ATF recruits. Specifically, I was a primary instructor for the arson block of training at the ATF Academy.

5.      This affidavit is based upon my personal knowledge as well as information provided to me by other federal, state, and local law enforcement officers during the course of their official duties, all of whom I believe to be truthful and reliable. This affidavit is also based upon information gathered from interviews of citizen witnesses, reports, official records, law enforcement reports, and my training and experience. Through my experience and training as a firearm and arson investigator, I am aware that

2

electronic devices, such as cellphones, can be used to store and save audio, video, and text files that can link to a variety of criminal activity. I am also aware that smart cellphones are capable of capturing location history for the device. I have previously applied for and received search and arrest warrants related to the crimes of arson and unlawful firearm possession, as well as other crimes. I know from training and experience that those that commit crimes commonly communicate, photograph, videotape, and organize using electronic devices, including by phone call, text message, electronic mail, messaging application, and social media.

6.      As an ATF agent, I have participated in the investigation of firearms and narcotics-related offenses, resulting in the prosecution and conviction of individuals and the seizure of illegal drugs, and weapons. Through my training and experience, I am familiar with the actions, habits, traits, methods, and terminology utilized by the traffickers and abusers of controlled substances.

7.      Based on my training, experience, and participation in drug trafficking and firearms trafficking investigations, I know and have observed the following:

   a. that people involved in drug trafficking and/or money laundering almost always keep records of their transactions; because drug trafficking generates large sums of cash, it requires the keeping of detailed records as to the purchase and distribution of drugs as well as the laundering of the proceeds; drug traffickers and money launderers typically keep documents demonstrating the purchase of assets, as well as bank records and other evidence of the accumulation of wealth through illegal activities, as well as the methods used to launder the proceeds; such records also typically provide evidence as to the identity of additional criminal associates who are facilitating the laundering of the drug proceeds on behalf of the organization; these records, unlike the controlled substances, are often maintained for long periods of time; such records are often maintained under the dominion and control of the drug traffickers and money launderers, and as such, are often kept in their residences, businesses, or other locations that they control, including vehicles on their property;

   b. that drug traffickers often purchase and/or title their assets in fictitious names, aliases or the names of relatives, associates, or business entities to avoid detection of these assets by government agencies;

3

c. that even though these assets are in names other than the drug traffickers, the drug traffickers actually own and continue to use these assets and exercise dominion and control over them;

d. that drug traffickers must maintain at their residence or other locations they control large amounts of U.S. currency in order to maintain and finance their ongoing drug business;

e. that it is common for drug traffickers to maintain books, records, receipts, notes, ledgers, airline tickets, receipts relating to the purchase of financial instruments and/or the transfer of funds, and other papers relating to the transportation, ordering, sale and distribution of controlled substances; the aforementioned books, records, receipts, notes, ledgers, etc., are maintained where the drug traffickers have ready access to them;

f. that it is common for drug dealers to secrete contraband, controlled substances, proceeds of drug sales and records of drug transactions, asset purchases and other items noted in the Attachment to this warrant in secure locations within their residences, storage lockers and/or garages associated with their residences, businesses, vehicles and/or other locations over which they maintain dominion and control, for ready access and to conceal these items from law enforcement authorities;

g. that in order to accomplish this concealment, drug traffickers frequently build stash places within their residences or business; there are a number of publications available instructing where and how to build stash places; copies of these types of publications have been found in the residences of drug traffickers;

h. that it is common for persons involved in drug trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and/or expenditure of drug proceeds, such as currency, financial instruments, precious metals and gemstones, jewelry, books, records, invoices, receipts, records of real estate transactions, bank statements and related records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, safe deposit box keys and money wrappers; these items are maintained by the drug traffickers within their residences, businesses or other locations over which they maintain dominion and control;

i. that drug traffickers often utilize electronic equipment such as computers and cellular telephones to generate, transfer, count, record and/or store the information described in items a, c, d, e, g, and h above;

4

j.  that when drug traffickers amass large proceeds from the sale of drugs, the drug traffickers attempt to legitimize these profits through money laundering activities; to accomplish these goals, drug traffickers often utilize domestic and international banks and their attendant services, securities brokers, professionals such as attorneys and accountants, casinos, real estate, shell corporations and business fronts and otherwise legitimate businesses which generate large quantities of cash;

k.  that the sale of controlled substances generates large quantities of United States currency in small denominations (commonly referred to as street money);

l.  that it is common for drug dealers to physically handle and count the street money after receiving it in exchange for the controlled substances, thereby leaving residue traces of controlled substances on the street money; law enforcement agencies own dogs which are trained to react to the scent of controlled substances and residue traces of controlled substances; and those trained dogs have reacted to drug tainted currency negotiated at banks and concealed in the residences, businesses, and other locations controlled by drug traffickers;

m.  that it is common for drug dealers to separate their street money by denomination and put this currency in rubber banded stacks in varying increments to facilitate quick counting;

n.  that the courts have recognized that the small and medium denominations of questionable currency, along with the manner in which the currency is handled, carried, and concealed may establish probable cause that there is a substantial connection between the questionable currency and drug transactions;

o.  that the Currency Transaction Report (CTR) (IRS Form 4789) which is required to be completed and filed with the IRS by all financial institutions on every currency transaction which exceeds $10,000, causes tremendous problems for drug traffickers when they attempt to negotiate their illegal profits at a financial institution;

p.  that in order to evade the filing of a CTR, drug traffickers often (structure) their currency transactions so that no one transaction exceeds $10,000 or they provide false or misleading information in an attempt to legitimize or conceal the source and/or ownership of the currency;

q.  that drug traffickers at times become fearful that their extravagant spending habits will bring them under scrutiny by the Internal Revenue Service or other federal, state, or local agencies.  In order to legitimize their spending, these traffickers file tax returns reporting

5

income commensurate with the amount of money they have spent during the year which they feel can be traced and documented by the government; the source of their income reported on these returns is usually falsely stated, misleading or generic in terms; retained copies of these returns are commonly kept by the traffickers in their residences, businesses, and other locations under the dominion and control of drug traffickers;

r. that drug traffickers commonly maintain addresses or telephone numbers in books, papers, or cellular telephone memory, which reflect names, addresses and/or telephone numbers of their associates in the trafficking organization;

s. that drug traffickers take or cause to be taken photographs of themselves; their associates, their property, and their product; these traffickers usually maintain these photographs in their possession;

t. that the courts have recognized that unexplained wealth is probative evidence of crimes motivated by greed, in particular, trafficking in controlled substances;

u. that drug traffickers commonly have in their possession, that is on their person, at their residences and/or their businesses, firearms, including but not limited to handguns, pistols, revolvers, rifles, shotguns, machine guns and other weapons; said firearms are used to protect and secure a drug traffickers property. Such property may include but is not limited to drug, jewelry, drug paraphernalia, books, records, and United States currency;

v. that the techniques and practices used by drug traffickers to avoid detection by law enforcement include, but are not limited to, the use of counter-surveillance, multiple locations at which to conduct drug related activities and to keep records and drug, hidden compartments in vehicles used to hide drug and currency, the use of pagers, voice mail, cellular telephones, pay phones, and the use of numerous associates and workers to further their criminal enterprise;

w. that drug traffickers commonly front (provide on consignment) cocaine and/or other controlled substances to their customers and associates, and they maintain the aforementioned books, records, ledgers, and notes of these transactions, most frequently in their residences;

x. that drug traffickers commonly use telephones, whether a land line (home telephone) or cellular telephones, to arrange for drug purchases or deliveries. It is also common for drug traffickers to maintain and use several cellular telephones at the same time.

6

Typically, when a drug trafficker switches to a new cellular telephone, he/she will keep that phone and not destroy it. Among other reasons, the Drug trafficker will do so to maintain the list of drug related contacts that have been accumulated; and

y. that drug traffickers usually keep paraphernalia for packaging, cutting, cooking, weighing, and distributing controlled substances in their residences and in stash house locations, specifically locations used by the conspiracy to conduct these activities that drug traffickers who conduct interstate transportation and distribution of controlled substances must therefore transport the controlled substances themselves or have couriers transport the drugs for them. Consequently, drug traffickers often keep records of such travel, including airline tickets, bus tickets, and Uber receipts.

## OFF-SITE SEARCH OF COMPUTERS AND CELL PHONES SEIZED

8. Based on my training and experience, I know that cell phones are necessary for drug traffickers to conduct their business in communicating with suppliers and customers. I also know that cell phone data is often downloaded to computers. Thus, I believe cell phones and computers will be located at places controlled by drug traffickers and that a search of these electronic devices will reveal evidence of drug dealing. Based upon my training, experience, and information related to me by agents and others involved in the forensic examination of computers and cell phones, I know that searching and seizing information from these devices requires agents to seize all electronic storage devices (along with related peripherals) to be searched later by a qualified computer/cell phone expert in a laboratory or other controlled environment. This is true because of the following: Searching computer and cell phones is a highly technical process which requires specific expertise and specialized equipment. There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software application or operating system that is being searched.

7

9. Searching computer systems and cell phones requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover hidden, erased, compressed, encrypted, or password protected data. Computer hardware and storage devices may contain booby traps that destroy or alter data if certain procedures are not scrupulously followed. Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted.

10. The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises. A single megabyte of storage space is the equivalent of 500 double spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double spaced pages of text. Storage devices capable of storing fifteen gigabytes of data are now commonplace in desktop computers. Consequently, each non networked, desktop computer found during a search can easily contain the equivalent of 7.5 million pages of data, which, if printed out, would completely fill a 10' x 12' x 10' room to the ceiling.

11. Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a computer user can conceal text in an image file

8

which cannot be viewed when the image file is opened. Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is evidence, contraband, or instrumentalities of a crime.

12. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 18 U.S.C. § 2119 (carjacking), Title 21 U.S.C. § 841(a)(1) (distribution of a controlled substance), and Title 18 U.S.C. § 1956 (money laundering) have been committed by Alfredo ACOSTA and others. There is also probable cause to search the information described in Attachment A for evidence of these crimes as further described in Attachment B.

**PROBABLE CAUSE**

13. In this application I will describe a robbery and shooting that took place February 19, 2023, and the investigation which led to my belief that the robbery was planned and executed by at least 6 individuals. The individuals involved included Alfredo ACOSTA, who ended up a shooting 'victim' due to the incident. This investigation has also led me to conclude that ACOSTA has used his cellphone(s) to communication with at least one carjacker regarding the carjacking/shooting, Damonti LOCKHART, as recently as early October 2023. Additionally, the investigation has shown that ACOSTA is actively engaged in the unlawful distribution of marijuana. Thus, I believe there is probable cause to search the TARGET RESIDENCE as it will have evidence of drug dealing and contain ACOSTA's cell phone with number, (414) 940-1675, which will also contain evidence of drug dealing and his involvement in the carjacking. I will highlight the alleged contact that ACOSTA had with Damonti LOCKHART, a carjacking co-conspirator, in which they recently discussed the carjacking likely would have been via ACOSTA'S cellphone by way of phone call, Facebook call, Apple Facetime call, or another communication through a social media app. I know through training and experience that voice or video

9

call(s) between LOCKHART and ACOSTA through social media applications can be captured on ACOSTA'S cellphone device but not reflect in the records captured by his cellphone carrier. Those contacts would be observed in the logs specific to the social media application found on ACOSTA'S device.

*Carjacking Investigation*

14.     On February 19, 2023, at approximately 5:43AM, the Milwaukee Police Department responded to a shooting near 1727 West Mineral Street, Milwaukee, Wisconsin **("Location 1")**. Upon their arrival, police subsequently located Alfredo ACOSTA, who had been shot multiple times. ACOSTA was found lying on the front porch of XXXX South 18th Street and transported to a hospital.

15.     The Milwaukee Police Department later interviewed ACOSTA who stated he and his friend, C.B., were at Potawatomi Casino and then went to a party near South 34th Street and West Pierce Street in Milwaukee **("Location 2")**. ACOSTA said he was driving a Chrysler 300 car that had been rented by his brother, who was later identified as M.A. As he and C.B. left the party and were walking to the Chrysler 300, ACOSTA said they were approached by 5 unknown black males wearing ski masks and carrying firearms. ACOSTA stated he was struck multiple times in the head by the suspects' firearms while the suspects demanded to know where "the money was." ACOSTA stated he told the suspects he did not know what they were talking about. ACOSTA further said the suspects went through his pockets and took his money, necklace, grills, cellphone [phone # (262) 283-2021], and keys to the Chrysler 300 rental car. ACOSTA said he and C.B. were then forced at gunpoint into the suspects' white SUV. ACOSTA stated the suspects drove him and C.B. to C.B.'s address after C.B. provided his address. ACOSTA said the suspects exited the SUV at one point, at which time he exited the SUV and attempted to run away. ACOSTA stated he heard multiple gunshots and was struck multiple times in his leg, ankle,

10

and foot. ACOSTA believed C.B. was targeted for the robbery because C.B. has posted social media videos in which C.B. had flashed a lot of money.

16. The Milwaukee Police Department also interviewed C.B, who was located at his residence - XXXX West Mineral Street. C.B. stated he posted a message on Facebook on February 18, 2023, asking if anyone wanted to go out. C.B. said he received a phone call from ACOSTA, who he has known since high school. C.B. stated he and ACOSTA made plans to go out together. C.B. said ACOSTA picked him up in a 4-door Chrysler rental car. C.B. stated he, ACOSTA, and their friend M.H. first went to Element Nightclub in downtown Milwaukee and then to Potawatomi Casino. While at the casino, C.B. stated he received a phone call from a female he knew as "Pat" who invited him to a party near South 34th Street and West Pierce Street in Milwaukee. C.B. further said he is friends with "Pat" on social media. C.B. stated he and ACOSTA dropped Michael at home before going to the party. C.B. said he and ACOSTA stayed at the party for approximately 45-60 minutes and then left. As they were approaching ACOSTA'S Chrysler rental car, C.B. said two unknown vehicles stopped by them and five unknown male suspects (suspects) exited one of the vehicles. All five were wearing masks. C.B. further said the masked suspects pointed firearms at C.B. and ACOSTA and C.B. was struck in the head with firearms prior to being forced into the suspect vehicle. C.B. said the suspects went through his pockets and took $200 cash and his Apple iPhone. C.B. said the suspects asked where they lived and C.B. provided his home address – XXXX West Mineral Street. C.B. further said ACOSTA fled the vehicle when they arrived at his address, so he also fled from the vehicle, ran into XXXX West Mineral Street, and did not come out until police arrived.

17. The Milwaukee Police Department recovered (24) 9mm ammunition casings from the shooting scene near 1727 West Mineral Street. Law enforcement later recovered the Chrysler 300 rental car that day on the North side of Milwaukee and observed it had been purposefully destroyed by fire (arson).

11

18. ATF subsequently obtained surveillance video of the carjacking as well as multiple cellphone records, as well as conducted several interviews. Ultimately, I believe the evidence shows that Geo OWENS played a role in coordinating the carjacking on February 19, 2023, and subsequent crimes, and OWENS' knowledge and participation is supported by his cellphone's movement to the area of the shooting after the carjacking. I also believe the Marquis HARRIS and Alfredo ACOSTA likely had prior knowledge of the carjacking and robbery based on the phone contacts with the people who appeared in the areas of the casino, the carjacking location, and the shooting location. HARRIS was identified as the third male who accompanied ACOSTA and C.B. to the party and was taken away from the carjacking scene in the Chrysler 300 by a suspect. The evidence showed that HARRIS came back into possession of his cellphone after it had been allegedly taken by carjackers. I believe that HARRIS was associated with OWENS, Jhony MARCHENA, Kentreal EVANS, LOCKHART, and the possessor of (414) 788-9051 because all of those numbers were in the call detail records for HARRIS. LOCKHART'S participation in the conspiracy is supported by the apparent presence of his cellphone in the area of the vehicle arson as well as recorded jail calls that will be detailed later in this affidavit. The timing and sequence of calls, and the general locations of devices at critical times leads Your Affiant to believe there was a conspiracy to conduct the carjacking and subsequent crimes on February 19, 2023, amongst the following persons and others: Geo OWENS, Jhony MARCHENA, Kentreal EVANS, the possessor of (414) 788-9051, Alfredo ACOSTA, LOCKHART, and Marquis HARRIS. I further believe that ACOSTA traveled with HARRIS' cellphone while HARRIS was at the casino. The conspirators' crimes include violations of Title 18 U.S.C. § 2119 (carjacking), Title 18 U.S.C. § 924(c) (use of a firearm during the commission of a violent crime), Title 18 U.S.C. §§ 844(i) (use of fire to damage property affecting interstate commerce), and Title 18 U.S.C. §§ 844(h) (use of fire in furtherance of a federal felony).

12

19.     Your Affiant previously obtained Meta Facebook records for Alfredo ACOSTA pursuant to Federal search warrant #23-MJ-140, which produced records up to August 16, 2023.  Those Meta Facebook records revealed a verified cellphone number for ACOSTA as (414) 940-1675, which is also the number ACOSTA has used to receive jail calls from incarcerated associates as recently as November 28, 2023.  Review of the Facebook records further revealed Facebook messenger communication between ACOSTA and C.B.  During the late evening hours of June 17, 2023, ACOSTA sent messages that encouraged C.B. to meet ACOSTA out somewhere, but C.B. was not able to meet ACOSTA.  During the early morning hours of June 18, 2023, ACOSTA and C.B. had the following exchange:

| | |
|---|---|
| **ACOSTA**: | "Quis here lol" |
| **C.B.**: | "On wha lol u see him rn?" |
| **C.B.**: | "Who he wit" |
| **C.B.**: | "Shit crazy u in there wit a limp cus of dude bitch bum ass i stg im mad asb now |

13

2023, at 8:06PM. A portion of the recorded jail call was spoken in Spanish and subsequently translated. J.T. informed ACOSTA that he had met a male at Dodge Correctional Institution named "Sheisty" who claimed he knew ACOSTA.  The below is a summary of that recorded call between J.T. and ACOSTA:

**JT**: *SPANISH: I told him ENGLISH: yeah, that's my—I was like that's my big brother, why? What's up? SPANISH: He told me ENGLISH: nah, I'm cool with him, woo SPANISH: but he said like ENGLISH: he told me, like, that the only issue like they have with you or some shit was when that shit happened to you and shit, supposedly, G pulled up and was, like, oh why they did that shit to you 'cause supposedly everything he did or some shit. I said man, you know what I'm saying—I told him like—you can't, like, feel no type of way 'cause at the end of the day when –if you was to get hit, bro, you gon'-you gon' , you know what I'm saying, you gon' think bad about everybody around you, bro, you feel me? 'cause you know how you move and you don't expect that shit to really happen to you like that, unless it's people that's close to you, you feel me?*

**ACOSTA**: *He said—they said that, what? That G what?*

**JT**: *He said that supposedly, uh, G got on his ass 'cause --he said that supposedly he was thinking it was him and some other---and Monty/Monti that, uh, had, you know what I'm sayin',  did that shit to you and shit.*

**ACOSTA**: *hmm*

**JT**: *And I was like, well—I was like well, I don't know my n—gga, like---*

**ACOSTA**: *SPANISH: Hey, are you with them right now?*

**JT**: *SPANISH: They are in the (unintelligible)*

**ACOSTA**: *Oh, okay, okay, okay*

**JT**: *SPANISH: Because they—they—they—they---they---when I got in here they—everyone tries to talk to me, bro, because when I enter places—the units—I don't talk to anyone, bro, I stay in my ENGLISH: lane*

**ACOSTA**: *SPANISH: Hey, don't give that asshole any information, you hear me?*

**JT**: *SPANISH: he's crazy, bro—*

**ACOSTA**: *ENGLISH: Hey, listen---hey, listen*

14

**JT**: *SPANISH: Tell me, tell me….*

**ACOSTA**: *SPANISH: It was them, you hear me? So be careful. They're going to try to talk to you and get information.*

22. My interpretation of the above conversation is that J.T. informed ACOSTA that associates of "G" named "Sheisty" and "Monty/Monti"—that is to say associates of Geo Owens: Zachary BEHRMAN-MCDONALD and LOCKHART—had something to do with shooting ACOSTA and ACOSTA confirmed those suspicions.

23. Your Affiant has reviewed a number of calls placed by and between various parties that were made using the Wisconsin Department of Corrections Inmate Solutions online calling system. As will be detailed below, I believe in these conversations "Fredo" refers to Alfredo ACOSTA; "sheisty" is Zachary BEHRMAN-MCDONALD (DOB: XX/XX/2002); "G" is Geo OWENS; "GTS Merk" or "Merk" is Marquis HARRIS and "Monti" is Damonti LOCKHART (DOB: 6/03/2003). In sum, I believe these conversations show that ACOSTA was contacted by LOCKHART who admitted his involvement in and knowledge of the robbery and shooting. Further, ACOSTA claimed that LOCKHART stated LOCKHART had a video of the shooting. I believe this video would most likely be contained on one or both of LOCKHARTS' cellphones: (414) 399-4919 and (414) 940-9151.

24. Your Affiant also reviewed recorded jail calls placed by Zachary BEHRMAN-MCDONALD (DOB: XX/XX/2002) while he was incarcerated at Dodge Correctional Institution between 8/04/2023 – 10/02/2023 and Oak Hill Correctional Institution between 10/02/2023 – 10/04/2023. The following is a summary of downloaded phone calls placed by BEHRMAN-MCDONALD during this timeframe.

25. On September 18, 2023, at 1:03PM, BEHRMAN-MCDONALD placed a recorded call to (414) 940-9151 and a male answered the call. Phone number (414) 940-9151 is a phone number listed to

15

Damonti LOCKHART at 4280 South 43rd Street, Milwaukee, WI according to the Wisconsin DOC Inmate Solutions payment history. BEHRMAN-MCDONALD asked the male, "Guess who I'm in here with?" and the male asked who. BEHRMAN-MCDONALD explained he was in Dodge Correctional with "Jay" and "Jay" claimed to have been at the Milwaukee County House of Corrections with the male. A query of Milwaukee County Jail records showed that Damonti LOCKHART (DOB: 6/03/2003) was at the Milwaukee County House of Corrections from May 27, 2023, until his release on GPS monitoring on August 23, 2023. BEHRMAN-MCDONALD further said that Jay was with him at the time of the call. BEHRMAN-MCDONALD further said that Jay is friends with "Fredo" and that "somebody got" Fredo. BEHRMAN-MCDONALD also said, "You need to check-in with somebody, too cuz… he said they took the watch, the Cuban, 60k." [Cuban is a known style for neck chains and ACOSTA reported a necklace was taken during the robbery]. LOCKHART originally appeared to not understand the reference that BEHRMAN-MCDONALD was making. LOCKHART subsequently responded, "Ooh…never…remember, Chubby got the Cuban and they never did get something off (unintelligible)…they never made nothing off that shit…" BEHRMAN-MCDONALD further said that Jay was telling him that "he" thought BEHRMAN-MCDONALD did "that" because BEHRMAN-MCDONALD "fucks with G". BEHRMAN-MCDONALD also said Jay had asked him who "GTS Merk" was and BEHRMAN-MCDONALD said he thinks Jay is referring to "Quis". BEHRMAN-MCDONALD said that Jay had explained the whole story about what happened to Fredo. LOCKHART asked if his name had been brought up and BEHRMAN-MCDONALD said no. BEHRMAN-MCDONALD said Fredo thought "G" had something to do with it. BEHRMAN-MCDONALD further said Jay told him that "they" were going to do the same thing to "G" because "G" had set that up. LOCKHART replied that he would tell "him" right now. BEHRMAN-MCDONALD instructed LOCKHART to tell "him" that something "fishy" was going on. LOCKHART said that Jay knew LOCKHART because LOCKHART'S

16

mother is Jay's "case manager". BEHRMAN-MCDONALD said that Jay said that Fredo was at the club with "GTS Merk" when GTS Merk asked Fredo to see his "water splasher" and then Fredo woke up and was getting hit with the "water splasher", and they put Fredo in a "white SRT". ["Water splasher" is a term often used for a water gun and I believe is used in this phone call to mean a real gun. "White SRT" appears to be a reference to the white Jeep Grand Cherokee SRT used by the robbery suspects as seen in surveillance videos.] Later in this same call, BEHRMAN-MCDONALD said that Jay had saw "G" in a strip club at one point and contacted Fredo and asked Fredo what he wanted to be done, and Fredo told Jay to leave him alone. BEHRMAN-MCDONALD instructed LOCKHART to tell "G" to stop being "so loose" and LOCKHART agreed to relay the message.

26. On September 19, 2023, at 11:37AM, BEHRMAN-MCDONALD placed a recorded call to (414) 388-7565 and a male answered the call. During the call, BEHRMAN-MCDONALD informed the male that "G" was holding onto money for BEHRMAN-MCDONALD. At the approximate 12:27 mark in the call, BEHRMAN-MCDONALD asked, "…remember I pulled that move with (unintelligible) and them?...and we put dude in a car and shit?" The male responded with a "yeah". BEHRMAN-MCDONALD said, "His nigga up in here. He was talking about it…the nigga said he lost a Cartier watch, 60 thousand…why do niggas be lying?" BEHRMAN-MCDONALD said they guy must've "took a loss before that."

27. On September 19, 2023, at 1:11PM, BEHRMAN-MCDONALD called LOCKHART at (414) 940-9151 and asked LOCKHART if LOCKHART had talked to "G" and told "G" what BEHRMAN-MCDONALD instructed LOCKHART to share with "G". LOCKHART said that "G" said "dude was soft" and to tell "little brother" to curse him and that "G" will spit in Fredo's mamma's face.

28. On September 29, 2023, at 1:10PM, BEHRMAN-MCDONALD placed a recorded call to Geo OWENS at (404) 735-9068. In the preamble of the call BEHRMAN-MCDONALD identified

17

himself to OWENS as "Sheisty". During the call, OWENS told BEHRMAN-MCDONALD that OWENS was working on a house on 11th Street. BEHRMAN-MCDONALD asked OWENS if "Cuz" told OWENS what BEHRMAN-MCDONALD has said. OWENS responded, "About Fred?" OWENS continued by alluding that he had talked to "Fred" and Fred claimed he had nothing to do with "that" and that he was just "talking".

29.    On October 4, 2023, at 1:01PM, BEHRMAN-MCDONALD called (414) 399-4919 (LOCKHART) and no one answered.

30.    On October 4, 2023, at 1:03PM, BEHRMAN-MCDONALD called LOCKHART at (414) 940-9151 and another male answered the call and BEHRMAN-MCDONALD asked where "Monti" was. BEHRMAN-MCDONALD also told the male to tell LOCKHART that BEHRMAN-MCDONALD just tried calling LOCKHART on his other number and LOCKHART didn't answer. LOCKHART eventually came on the phone to speak to BEHRMAN-MCDONALD.

31.    On October 13, 2023, J.T, placed another recorded jail call to ACOSTA and ACOSTA told J.T. that ACOSTA had recently been contacted by "Monty/Monti". The following is summary of the recorded jail call between J.T. and ACOSTA on October 13, 2023:

ACOSTA: *On Saturday, he called me. He called me and said---he said---well, he said, oh yeah, I didn't have anything to do with that. I didn't' have anything to do with it…and I told him, asshole, I'm not a fucking idiot, crazy…woo, woo…I know you did it….Sheisty then said----*

JT: *Look, it was both of them. You have to tell him, 'look, Sheisty was fucking around there…and you and him were the ones that did it and there were more because he admitted it.' He told me out there at Dodge---*

ACOSTA: *Yeah. No, no, no, no, no, no ---listen to me, listen to me…*

JT: *what?*

18

**ACOSTA:** *After---after, when I told him, asshole let say it because this'll incriminate him put him on the hook. He said, okay, bro, okay, umm, I am sorry but it wasn't for you, you weren't supposed to be there. It was for the "guerrito" (white guy/ fair skinned), woo woo…..* [I believe this is an acknowledgment that the robbery/shooting was meant for C.B. and not ACOSTA]

**JT:** *Nah, that's bullshit, bro.*

**ACOSTA:** *he said—he said---umm, it wasn't—I have a video, fool, I—I—I recorded everything. We were scared, woo*

**JT:** *Bro, listen, he's living on M (or N) at Sheisty's mom's house. Tell him to take my name outta his mouth and----*

**ACOSTA:** *yeah, he told me that Jacob Torres and there were---there were two more that were talking, saying "we did it", woo and that---that all over there at that jail they were saying that "we did it" and woo*

**JT:** *he knows---he knows so he's telling me that he is the shooter you so that you come and he was telling me but you know more/better than that, bro. You need to tell them, bro, you need to tell---*

**ACOSTA:** *No, I told him…I told him. And that asshole tells me everything, he tells me who did it, who----who did it to me---I'm telling you, he told me like that, fool, he told me everything. He said, he said, okay, bro, but I didn't do it. It was these people, these people, these people----*

32. My interpretation of the above recorded jail call is that LOCKHART contacted ACOSTA and they discussed the carjacking and shooting, and LOCKHART made admissions. I believe the contact that ACOSTA had with LOCKHART would have been via his cellphone by way of phone call, Facebook call, Apple Facetime call, or another communication through a social media app. I know through training and experience that voice or video call(s) between LOCKHART and ACOSTA through social media applications can be captured on ACOSTA'S cellphone device but not reflect in the records captured by his cellphone carrier. Those contacts would be observed in the logs specific to the social media application found on ACOSTA'S device.

19

33.     Additional review of ACOSTA'S Facebook records showed multiple communications between ACOSTA and several individuals in which ACOSTA is either offering to sell marijuana to the individuals or the individuals are asking to purchase marijuana from ACOSTA.

34.     The last Facebook messenger contact between ACOSTA and C.B. in the records was on June 19, 2023.  During the message thread, C.B. refers to needing to pay ACOSTA for "real za", which is a term associated with marijuana.  On June 19, 2023, C.B. messaged ACOSTA, "We at 4800 on the smoke tab". I believe this to mean that C.B. owed ACOSTA $4800 for prior marijuana purchases.

35.     The following is a summary sample of communications between ACOSTA and others regarding the sale of marijuana and does not include all statements related to narcotic sales:

36.     The records showed that ACOSTA sent a photo to MARCHENA on November 9, 2022, that depicted what I recognized to be a bag of marijuana. After he sent the photo to MARCHENA, ACOSTA then sent MARCHENA the following message: "Sale them my boi sent pic of yo og ones I'll try to move them hoes".  To which MARCHNENA replied, "Ight".

37.     ACOSTA had the following communications with Facebook username "Aldo Moreno":

*June 23, 2023*

**Moderno**:     "Let me get right and I got you. What's up prices? Rn?"

**ACOSTA**:     "Bro yo ass owe me $5600 lol I'm fucked up rn I need something u better sale that motorcycle ama start impounding shit lol ″

**ACOSTA**:     "I got za"

**ACOSTA**:     "1600"

20

**ACOSTA**: "Come get this hp of za" [Which is refers to a ½ pound of marijuana]

**Moreno**: "How much?"

**ACOSTA**: "850"

38. On August 16, 2023, ACOSTA informed Facebook user "Jay Alimana" that ACOSTA was selling one pound of "za" (marijuana) for $1650.

39. On July 24, 2023, ACOSTA informed Facebook user "Richie Con" that ACOSTA had two types of marijuana for sale. ACOSTA explained that one type of marijuana was $1250 per pound and the other type was $1150 per pound. ACOSTA further sent Richie Con a video that depicted a bag of marijuana and stated that the marijuana in the video was $1150 per pound. On August 7, 2023, ACOSTA sent Richie Con a message in which ACOSTA offered to sell Richie Con "10 for 10k".

40. On March 4, 2023, ACOSTA provided his cellphone number as (323) 301-1476 to Facebook user "Keon McNeal". On August 4, 2023, ACOSTA informed Keon McNeal that ACOSTA had "za" and then sent McNeal a video that depicted a bag of marijuana.

41. On August 15, 2023, ACOSTA messaged Facebook user "Mario Ridgell" and asked Ridgell if they still used "gas", which is another term for marijuana. ACOSTA then sent Ridgell a video that depicted a bag of marijuana. It is noteworthy that the Facebook records provided under the search warrant did not include dates after August 16, 2023.

42. On May 16, 2023, ACOSTA informed Facebook user "Ben Gee" that ACOSTA had "za packs for 1350 & 1700". Gee asked what they looked like, and ACOSTA sent Gee a video that depicted a bag of marijuana.

43. ATF also obtained data files from Apple Incorporated related to Apple account fredoa26@icloud.com, which is an account associated with Alfredo ACOSTA. The data was obtained

21

via Federal search warrant #23-MJ-141.  The following is a summary of information reviewed from Apple account [fredoa26@icloud.com](mailto:fredoa26@icloud.com) as provided by Apple Incorporated:

44.     A review of the photo library revealed a screenshot of an Expedia travel itinerary in the name of Alfredo ACOSTA.  The Expedia screenshot showed a round-trip e-ticket for United Airlines from Chicago-O'Hare to LAX on 8/16/2022 – 8/19/2022.  The reservation number was O9EE0M, and the ticket number was 0167830353693.   The photo library also included multiple selfie images of ACOSTA standing in, what appeared to be, a hotel room while holding a large stack of US currency.  The hotel selfie images were dated August 17, 2022, and one of those images is depicted below:



45.     Further review of the photo library revealed an image dated September 8, 2022, in which ACOSTA is depicted holding a large bag of a green leafy substance consistent with the

22

appearance of marijuana. The same photograph included two other large bags of green leafy substances and an open suitcase on the floor, as seen below:



46. Based on the above images and timeline, I believe that Alfredo ACOSTA traveled to California in August 2022 and purchased a large quantity of marijuana for distribution.

47. ATF obtained additional data files from Apple Incorporated related to Apple account joel.a4@icloud.com, which is a second account associated with Alfredo ACOSTA. The data was obtained via Federal search warrant #23-979M(NJ). The following is a summary of information reviewed from Apple account joel.a4@icloud.com as provided by Apple Incorporated:

48. Bags of leafy substances consistent with the appearance of marijuana were depicted in videos created or modified on multiple dates, including: 1/24/2023, 2/08/2023, and 2/09/2023. Your Affiant also viewed a video that showed the inside of a vehicle with a bundle of US currency in the

23

center console and a pistol with an extended magazine on the front passenger seat. That video was created or modified on February 5, 2023.

49. On January 23, 2024, ATF received additional records from Meta regarding Facebook account "Alfredo Acosta" with ID #100004126687957 pursuant to Federal Search Warrant #24-MJ-4. The following is a summary of the records provided by Meta related to the Facebook account for Alfredo ACOSTA from 8/16/2023 – 1/04/2024:

50. The review of the Facebook records for Alfredo ACOSTA showed multiple communications between ACOSTA and several individuals in which ACOSTA offered to sell marijuana to the individuals or the individuals were asking to purchase marijuana from ACOSTA. The following is a summary sample of communications between ACOSTA and others regarding the sale of marijuana and does not include all statements related to narcotic sales:

51. On November 28, 2023, ACOSTA informed Facebook username "Bla Ken" that ACOSTA had "za" for sale and then ACOSTA sent a photograph that depicted, what appeared to be, a bag of marijuana, as well as videos of marijuana. "Bla Ken" said he would reach out to ACOSTA. On January 3, 2024, ACOSTA provided his cellphone number to "Bla Ken" as (213) 332-0611.

52. The records also showed that ACOSTA had multiple exchanges with Facebook username "Oscar Avila" regarding the sale of "za" and "cookie" from ACOSTA to Oscar Avila. Additionally, the two engaged in conversations regarding a debt owed from Oscar Avila to ACOSTA. On December 3, 2023, Oscar Avila asked ACOSTA for "za", and ACOSTA responded that he had "runtz" for sale. ACOSTA offered to sell 3 (pounds) of runtz for "14 each" ($1400 per pound). Based on the message exchanges, ACOSTA appeared to deliver 2lbs of "runtz" to Oscar Avila on December 5, 2023. On January 3, 2024, Oscar Avila attempted to contact ACOSTA.

24

53. On December 23, 2023, ACOSTA sent videos of, what appeared to be, bags of marijuana to Facebook usernames "Richie Con" and "Brian Sims".

54. On December 26, 2023, ACOSTA sent a photograph and a video that depicted, what appeared to be, bags of marijuana to Facebook username "Jacob Torres". On December 29, 2023, ACOSTA offered to sell Jacob Torres 2 (pounds) of "snow cookie" marijuana for $2,000.

55. On December 31, 2023, ACOSTA informed Facebook username "Irving Alanis" that ACOSTA was "dry" until January 3, 2024, after Irving Alanis asked if he could pick up something from ACOSTA. On January 2, 2024, Irving Alanis shared a screenshot of a text message exchange in which an unknown user asked if they could get "20-30". Irving Alanis then messaged ACOSTA, "Lmk I wanna serve these mfs", "Maybe him em". ACOSTA responded, "I gotchu when I touchdown." I believe this communication between ACOSTA and Irving Alanis refers to ACOSTA returning on an airplane with a large amount of marijuana (at least 20-30 pounds) that ACOSTA will then supply to Irving Alanis for further distribution.

56. An ATF Forensic Auditor has examined bank records for Alfredo ACOSTA obtained via subpoena from Chase Bank and Landmark Credit Union. Notably, ACOSTA deposited over $91,000 into his Landmark Credit Union account in 2022 via Cash App, cash deposits, and ATM deposits. Additionally, ACOSTA deposited over $37,000 into that same account from January 1, 2023 – June 23, 2023, via Cash App, cash deposits, and ATF deposits. I believe the bulk (if not all) of these deposits were likely proceeds from narcotic sales because ACOSTA does not appear to have had verified employment since 2021.

57. Based on the information presented in thus far, I believe that Alfredo ACOSTA has engaged in the trafficking of large amounts of marijuana for an extended period of time, since at least approximately August 2022. I further believe that ACOSTA continues to presently engage in the

25

trafficking of marijuana and that evidence of such trafficking will be present within the Target Residence, ACOSTA's residence where I know he currently resides. My investigation has not shown any stash house or other premises associated with ACOSTA where controlled substance evidence would be located.

58. ATF requested that North Central HIDTA to query the name Alfredo ACOSTA for active utility accounts. On October 17, 2023, the HIDTA Investigative Support Center reported via email that Alfredo ACOSTA had an active utility account at 5674 South 14th Street, Milwaukee, WI since 8/08/2023.

59. On October 19, 2023, Your Affiant conducted surveillance of 5674 South 14th and observed the overhead garage door of the residence open at approximately 7:00AM. When the garage door opened, Your Affiant observed a black Jeep Grand Cherokee with WI plate ANX-2701 parked inside the garage. The Jeep Grand Cherokee subsequently left the residence and later returned at approximately 8:00AM and parked again inside the garage, and the garage door closed. A query of the Jeep Grand Cherokee with WI plate ANX-2701 revealed it is registered to Alfredo ACOSTA.

60. On January 24, 2024, ATF conducted surveillance of 5674 South 14th and observed a silver Hyundai Palisade SUV with Wisconsin Dealer Plate MV 5095 B pull into the driveway at approximately 8:34am. The overhead garage door opened when the SUV pulled into the driveway. Your Affiant then observed a Hispanic female exit the front passenger door of the SUV and walk into the garage and out of sight. Your Affiant further observed a Hispanic male exit the driver door of the SUV who Your Affiant recognized as Alfredo ACOSTA. ACOSTA also walked into the garage and out of sight. ATF captured photographs of the SUV, ACOSTA, and the Hispanic female.

61. On October 23, 2023, at approximately 5:15AM, ATF retrieved discarded plastic garbage bags from inside a garbage bin located on the roadside curb in front of 5674 South 14th Street. Agents later examined the contents of the garbage bags from 5674 South 14th Street. Agents located a Chase Bank ATM deposit receipt dated October 21, 2023, at 4:30AM. The receipt showed that $4,180 dollars

26

in twenty-dollar bills was deposited into Chase checking account ending in 7529. According to the receipt, the account had a balance of $38 prior to the deposit at 4:30AM. Later review of official Chase Bank records previously obtained via federal subpoenas showed that Alfredo ACOSTA had a Chase Bank checking account in his name that ended in 7529. A further review of ACOSTA'S bank records that ATF previously obtained via federal subpoenas showed he last received a payroll deposit from an employer in 2019. I believe the cash deposit reflected in the Chase Bank ATM receipt was likely money gained by ACOSTA from the sale of narcotics. ATF conducted another trash-pull on December 4, 2023, at ACOSTA'S residence but found no evidentiary items in the trash bags.

62. On November 8, 2023, ATF obtained Federal Search Warrant #23-MJ-185 signed by Magistrate Judge William Duffin which, among other data captured, allowed ATF to acquire approximate real-time location data for ACOSTA'S cellphone number (414) 940-1675. Based on cellphone carrier data from US Cellular, ACOSTA'S cellphone has routinely been in the area of 5674 South 14th Street, Milwaukee, Wisconsin during the morning hours when ATF has requested location updates from US Cellular. More specifically, ACOSTA'S cellphone was in the area of 5674 South 14th Street at the following times:

11/09/2023 at 8:04AM

11/10/2023 at 8:51AM

11/13/2023 at 10:14AM

11/20/2023 at 9:50AM

US Cellular ping data required that ATF call the provider for that real-time information, which is not automatically captured nor stored by US Cellular. The data range for the ping warrant was 11/08/2023 – 12/08/2023.

**CONCLUSION**

63. As described within this affidavit, ACOSTA has established a continuous and ongoing pattern of distributing controlled substance since at least approximately August 2022. Specifically, the evidence has shown that ACOSTA routinely acquires multiple pounds of marijuana and sells multiple pounds of marijuana on a regular basis. Based on the investigation to date, I believe that ACOSTA stores controlled substances and the items listed in Attachment B associated with controlled substance trafficking at TARGET PREMISES, where I believe ACOSTA resides.

64. Investigators also believe that there are likely multiple cellular telephones and other electronic devices located at TARGET PREMISES. Based on my training and experience, I am aware that a drug dealer like ACOSTA often uses multiple cell phones to conduct their drug-trafficking activity. Additionally, drug dealers also rotate cellular devices, meaning they will stop using a phone for a period of time and then use it again at a later date. These phones, as well as any computers, tablets, or other electronic devices located in the residence would likely contain evidence of that dealing and may include Facetime call logs; messages stored within encrypted communication applications such as WhatsApp, Telegram, Signal, etc.; photographs of drugs, drug paraphernalia, or weapons; notes; internet search histories; and ledgers. Additionally, the seizure of ACOSTA's cellular telephones would assist investigators in corroborating his user of these devices.

**AUTHORIZATION REQUEST**

65. Based on the foregoing, I respectfully request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41, authorizing a complete search of TARGET PREMISES, as further described in Attachment A and to seize items located in Attachment B.

28

# ATTACHMENT A

## Property to Be Searched

1.     5674 South 14th Street, Milwaukee, Wisconsin is a two-story, single-family residence located on east side of South 14th Street.  The residence includes tan siding, white privacy fence and an attached two-car garage.  The property also includes a detached shed located in the backyard.  The number "5674" is affixed on the attached garage and is visible from South 14th Street.  The building is depicted below:



1

<u>**ATTACHMENT B**</u>

**Particular Things to be Seized**

Violations of Title 18 U.S.C. § 2119 (carjacking), Title 21 U.S.C. § 841(a)(1) (distribution of a controlled substance), and Title 18 U.S.C. § 1956 (money laundering). More specifically, the controlled substances include  marijuana, and any other controlled substances; paraphernalia associated with the use, storage, distribution, possession and/or manufacture of controlled substances, including but not limited to, scales, drug packaging materials, buyers and sellers lists; containers associated with the storage of controlled substances; various other chemicals, utensils, equipment or apparatus associated with the manufacture of controlled substances; and the following:

1)      Books, records, receipts, bank statements and records, money drafts, letters of credit and/or other documents relating to financial transactions;

2)      Address and/or telephone books and papers reflecting names, addresses and/or telephone numbers;

3)      Books, records, receipts, notes, ledgers, photographs, videos, and other papers relating to the transportation, ordering, manufacture, possession and/or distribution of controlled substances;

4)      Indicia of occupancy, residency and/or ownership of the premises described above, including, but not limited to utilities and telephone bills, cancelled envelopes, keys and lease agreements, loan records and/or any other document which contains indicia of occupancy;

5)      U.S. currency and any other financial instruments or proceeds; Records of accounts and transactions involving electronic currency and their platforms, including the keys or recovery codes for associated accounts, transaction confirmations, account statements, communications, and documentation of any transactions or their purpose;

6)      United States Postal Parcel boxes, receipts, labels and shipping related items;

7)      Counter surveillance devices such as video surveillance systems and radio communications systems;

8)      Firearms, ammunition, or that may represent possession of a firearms in furtherance of drug trafficking;

2

9)  Safes and their contents;

10) Electronic equipment and devices, including but not limited to: computers and associated memory storage devices, cellular telephones, and pagers, answering machines and caller ID devices, and a forensic examination of any memory data contained therein; and

11) For any electronic storage device, computer hard drive, electronic device, or other physical object upon which electronic information can be recorded (hereinafter, electronic storage device) that is called for by this warrant, or that might contain things otherwise called for by this warrant:

    a.  evidence of who used, owned, or controlled the electronic storage device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

    b.  evidence of software that would allow others to control the electronic storage device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

    c.  evidence of the lack of such malicious software;

    d.  evidence indicating how and when the electronic storage device was accessed or used to determine the chronological context of electronic storage device access, use, and events relating to crime under investigation;

    e.  evidence indicating the electronic storage device user's location and state of mind as it relates to the crime under investigation;

    f.  evidence of the attachment to the electronic storage device of other storage devices or similar containers for electronic evidence;

    g.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the electronic storage device;

    h.  evidence of the times the electronic storage device was used;

    i.  passwords, encryption keys, and other access devices that may be necessary to access the electronic storage device;

    j.  documentation and manuals that may be necessary to access the electronic storage device or to conduct a forensic examination of the electronic storage device; and

3

k.  contextual information necessary to understand the evidence described in this attachment.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the ATF may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

4